NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO J.R.

No. 1 CA-JV 24-0080

FILED 10-22-2024

Appeal from the Superior Court in Maricopa County
No. JS520569
The Honorable Adele G. Ponce, Judge

**AFFIRMED**

COUNSEL

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant Father*

Stuart & Blackwell, PLLC, Chandler
By Cory A. Stuart
*Counsel for Appellee Mother and Stepfather*

Canizales Law, PLLC, Phoenix
By Carrie Shew Canizales
*Counsel for Appellee Child*

---

**MEMORANDUM DECISION**

Presiding Judge Michael S. Catlett delivered the decision of the Court, in which Judge Jennifer M. Perkins and Vice Chief Judge Randall M. Howe joined.

---

**C A T L E T T**, Judge:

¶1        John R. ("Father") appeals the juvenile court's termination of his parental rights as to J.R. ("Child"), arguing the court did not consider the totality of the circumstances in its best interests analysis.  Because the record sufficiently supports the court's findings, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        In 2012, Father and Cristina W. ("Mother") met online and started a romantic relationship after meeting face-to-face.  The next year, Mother gave birth to Child.  Father and Mother never married but lived and raised Child together.  In 2014, Mother and Father separated.

¶3        Following their separation, Father and Mother followed an informal parenting schedule—Mother was the primary caregiver and Father took care of Child every other weekend.  This arrangement continued through 2015, but then Father's visits with Child significantly decreased.  In 2016, Father took care of Child twice and his last in-person visit was in February of that year.

¶4        In 2018, Father moved to Missouri and Mother married Christopher W. ("Stepfather").  That year, Father had two video calls with Child and maintained contact with Mother through Facebook Messenger.  Father requested several more video calls between 2018 and 2019, but Mother did not facilitate any calls.  In June 2019, they scheduled a video call for that month and Child was excited to see Father.  Father, however, missed the call because he forgot about it and fell asleep.  Child was "devastated."  Father subsequently asked to talk to Child a few more times, but Mother believed further communication could emotionally or psychologically harm Child.

¶5        After 2019, communication between Father and Mother became more infrequent.  Then, in July 2023, Father accused Mother of

preventing him from seeing Child and, by doing so, abusing child. Father threatened legal action if Mother did not agree to his demands.

**¶6** Mother agreed to work on establishing a relationship between Father and Child. But she demanded that a therapist be involved because several years had passed with no communication between Father and Child. Father agreed a therapist should be involved but insisted upon immediate communication with Child and asked for Child to visit him in Missouri before school started. Mother refused. Father said he would initiate court proceedings to establish contact with Child. In August 2023, Mother filed a petition to terminate Father's parental rights.

**¶7** At the termination hearing, Mother testified that, in addition to the lack of communication from Father, he sent no cards and only a few gifts to Child, and the only financial assistance he sent to Mother and Child was $100 in 2015. She also explained that Child has a father-son relationship with Stepfather—they play baseball and do various other father-son activities, including teaching Child how to swim and ride a bike. Stepfather wants to adopt Child, and Child refers to him as "daddy," uses his last name, and hopes to be adopted.

**¶8** Father responded that it would not be in Child's best interests to cut him out of Child's life even though there were periods of time with no communication. He testified that he has stable housing with his wife and two stepchildren and Child will benefit from having a relationship with his family. He also argued termination would harm Child because Child might believe that his biological father abandoned him, and Father blamed Mother for cutting him out of Child's life. Father also said he is willing and able to provide child support.

**¶9** Following the hearing, the juvenile court terminated Father's parental rights. The court concluded that Mother proved abandonment by clear and convincing evidence. The court also found termination would be in Child's best interests because Stepfather has cared for him since 2016, is his father figure, and intends to adopt him. The court also concluded that termination would not be detrimental to Child because he has not had Father in his life for more than five years. Rather, the court determined that failing to terminate Father's parental rights would be detrimental because Stepfather would be precluded from adopting Child and from thereby providing permanency and stability in Child's life.

**¶10** Father timely appealed. We have jurisdiction. *See* A.R.S. § 8-235(A).

3

**DISCUSSION**

**¶11**        Father concedes abandonment and argues only that the court did not properly consider the totality of circumstances when making its best interests finding.

**¶12**        "Parents have a fundamental right to raise their children as they see fit, but that right is not without limitation." *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 79 ¶ 14 (App. 2001). Consequently, parental rights may be terminated based only on the grounds in A.R.S. § 8-533(B). *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248–49 ¶ 12 (2000). A party seeking termination must first prove, by clear and convincing evidence, that one of those grounds exists. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149 ¶ 8 (2018); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 22 (2005). The party must also prove, by a preponderance of the evidence, that termination is in the child's best interests. *Alma S.*, 245 Ariz. at 149–50 ¶ 8; *Kent K.*, 210 Ariz. at 284 ¶ 22. We review a termination order for an abuse of discretion. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474 ¶ 14 (2022). We affirm the juvenile court's factual findings unless no reasonable fact finder could find the evidence to be sufficient. *Brionna J. v. Dep't of Child Safety*, 255 Ariz 471, 478–78 ¶ 30–31 (2023).

**¶13**        Father argues the juvenile court erred by not considering Mother's alleged interference in his efforts to establish a relationship with Child. For support, Father relies on *Calvin B. v. Britanny B.*, which explained that one parent's interference with the other's opportunity to develop a normal parental relationship with their child cannot be used to terminate based on abandonment. 232 Ariz. 292, 297 ¶ 21 (App. 2013). But, in *Calvin B.*, the parent challenged only the juvenile court's abandonment finding, and did so on grounds that the other parent restricted interactions. *Id.* The parent did not challenge the juvenile court's best interests finding, and so this court did not undertake a best interests analysis. *Id.* at 298 ¶ 31 n.5. We have the opposite situation here—Father concedes abandonment but challenges the best interests finding. *Calvin B.* is, thus, inapposite.

**¶14**        The juvenile court applied the proper legal standard for best interests. Once a court finds grounds for termination, it must consider whether the child will benefit from termination *or* will be harmed without it. *Alma S.*, 245 Ariz. at 150 ¶ 13. "Framed in the disjunctive, this standard permits a finding of best interests based on either a benefit to the child from severance or some harm to the child if severance is denied." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4 ¶ 16. The juvenile court must consider the totality

of the circumstances at the time of termination. *Alma S.*, 245 Ariz. at 150–51 ¶ 13.

**¶15** In deciding best interests, the juvenile court must analyze the "child's interest in stability and security." *Id.* at 150 ¶ 12. And courts should not subordinate the interests of the child to those of the parent. *Id.* at 151 ¶ 15. This is especially true when termination is based on a statutory ground that demonstrates parental unfitness—like abandonment. *See id.* at 150 ¶ 10 (abandonment is a "prox[y] for parental unfitness because [it] demonstrate[s] a parent's inability to 'properly parent his/her child.'"). Once a court finds clear and convincing evidence of abandonment, it presumes the "interests of the parent and child diverge." *Id.* at ¶ 12.

**¶16** The factors a court may consider when determining whether termination is in the best interests of the child are whether: 1) an adoptive placement is immediately available, 2) the existing placement meets the child's needs, and 3) the child is adoptable. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379 ¶ 30 (App. 2010); *Demetrius L.*, 239 Ariz. at 2 ¶ 1 (holding that a juvenile court may conclude adoption is in the child's best interests in proceedings initiated by the state or a private party).

**¶17** Here, the juvenile court determined Mother credibly testified that she and Stepfather "have been caring [for] the child continuously since around 2016" and "[S]tepfather intends to adopt the child." It also found Stepfather credibly testified he is Child's father figure and has a parental relationship with Child. The court also found Child wishes to be adopted and uses Stepfather's last name. The court concluded Child will benefit from adoption and the associated stability and permanency, and Child would be harmed if Father's parental rights were not terminated, making adoption impossible. Based on the record evidence, the court did not err in concluding that termination is in Child's best interests and it applied the correct standard in doing so.

**¶18** Father also takes issue with what he terms as the court's failure to recognize the "retaliatory nature of the termination petition." Even if, however, we assume the petition was retaliatory, Father cites no statute or caselaw requiring courts to consider a petitioner's subjective motives during the best interests inquiry. Nor does he explain how Mother's subjective motives are relevant to whether termination is in Child's best interests. Put differently, Father's argument focuses on his own interest in avoiding retaliatory filings rather than Child's interest in stability and security—the latter is the proper focus under Arizona law. *See Alma S.*, 245 Ariz. at 151 ¶ 12. The juvenile court did not err in declining, as part of

its best interests analysis, to consider Mother's subject motives in seeking termination.

## CONCLUSION

¶19　　　　We affirm.



AMY M. WOOD • Clerk of the Court
FILED:　AGFV